IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DOMINIQUE BOYD, individually and as independent administrator of, and on behalf of, the ESTATE OF ANYA WYNE and Anya Wyne's heirs at law, | § § § § § | |
| Plaintiff, | § § | Civil Action No. 1:21-cv-01139 |
| v. | § § | **JURY DEMANDED** |
| TRAVIS COUNTY, TEXAS; TRAVIS COUNTY SHERIFF SALLY HERNANDEZ; EDWARD VASQUEZ; JENNIFER JENNINGS; CHRISTINA BOTKIN; KAREN COTTON; CINDI LEAL; TIFFANY BELFROM; ALTHEA ROLLER; JOSIEJOSIE BARRIENTES-DOMINGUEZ; GEORGE ROMAN; and MAXIM HEALTHCARE SERVICES, INC. | § § § § § § § § § § § § § | |
| Defendants. | | |

## FIRST AMENDED PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, DOMINIQUE BOYD, individually and as independent administrator of, and on behalf of, the ESTATE OF ANYA WYNE and Anya Wyne's heirs at law, files this 42 U.S.C. § 1983 lawsuit against Defendants TRAVIS COUNTY, TEXAS; TRAVIS COUNTY SHERIFF SALLY HERNANDEZ; EDWARD VASQUEZ; JENNIFER JENNINGS; CHRISTINA BOTKIN; KAREN COTTON; CINDI LEAL; TIFFANY BELFROM; ALTHEA ROLLER; JOSIE BARRIENTES-DOMINGUEZ; GEORGE ROMAN; and MAXIM HEALTHCARE SERVICES, INC., and would show the Court and Jury the following in support thereof:

### I.   PARTIES

A.   **Plaintiff**

1.   Plaintiff, DOMINIQUE BOYD is the natural brother of ANYA WYNE, deceased.

He is a resident of Hampden County, Massachusetts and sues in his capacity as the Independent Administrator of the ESTATE OF ANYA WYNE, and on behalf of all statutory beneficiaries under the Texas Wrongful Death Act pursuant to agreement of all the beneficiaries.

2.      Anya Wyne (hereinafter "Ms. Wyne") died intestate, and Plaintiff, DOMINIQUE BOYD, was appointed as Independent Administrator of the ESTATE OF ANYA WYNE by the Probate Court of Travis County, Texas on December 10, 2021.

3.      Anya Wyne died having no surviving spouse.

4.      Anya Wyne died with no surviving children.

**B.      Defendants**

5.      Defendant TRAVIS COUNTY, TEXAS (hereinafter "TRAVIS COUNTY") is a governmental entity in Texas. It may be served through its County Judge, Andy Brown, at 700 Lavaca, Suite 2.300, Austin, TX 78701. This Defendant has been served and appeared in this litigation.

6.      At all relevant times, the policymaker for the Travis County Sheriff's Office (hereinafter "TCSO") was the elected Sheriff, Defendant TRAVIS COUNTY SHERIFF SALLY HERNANDEZ (hereinafter "SHERIFF HERNANDEZ").

7.      At all relevant times, Sheriff, Defendant, SHERIFF HERNANDEZ was an agent, employee, and policymaker of Travis County and acting within her scope as such.

8.      Defendant SHERIFF HERNANDEZ was elected Sheriff of Travis County, Texas on November 8, 2016. She won re-election on November 3, 2020. As such, Sheriff Hernandez is and was the policymaker for the TCSO at all relevant times. Upon information and belief, she is a resident of Travis County, Texas. At all relevant times, she was acting under color of law. She is

sued in her official and individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

9.      Defendant Sergeant EDWARD VASQUEZ (hereinafter "VASQUEZ") is a Sergeant of the Travis County Sheriff's Office. He is employed in Travis County, Texas. At all relevant times, he was acting under color of law. He is sued in his individual capacity for damages. He may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

10.     Defendant Lieutenant JENNIFER JENNINGS (hereinafter "JENNINGS") is a lieutenant of the Travis County Sheriff's Office. She is employed in Travis County, Texas. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

11.     Defendant Sergeant CHRISTINA BOTKIN (hereinafter "BOTKIN") is a Sergeant of the Travis County Sheriff's Office. She is employed in Travis County, Texas. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

12.     Defendant KAREN COTTON (hereinafter "COTTON") is an employee of the Travis County Sheriff's Office. She is employed in Travis County, Texas. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

13.     Defendant CINDI LEAL (hereinafter "LEAL") is a corrections specialist of the Travis County Sheriff's Office. She is employed in Travis County, Texas. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

14.     Defendant TIFFANY BELFROM (hereinafter "BELFROM") is a mental health counselor of the Travis County Sheriff's Office. She is employed in Travis County, Texas. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

15.     Defendant ALTHEA ROLLER (hereinafter "ROLLER") is a deputy of the Travis County Sheriff's Office. She is employed in Travis County, Texas. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

16.     Defendant JOSIE BARRIENTES-DOMINGUEZ (hereinafter BARRIENTES-DOMINGUEZ") was a licensed vocational nurse at the Travis County Sheriff's Office in Travis County, Texas, an agent of the Travis County Sheriff's Office, and employed by Defendant MAXIM HEALTHCARE SERVICES, INC. in December of 2019. At all relevant times, she was acting under color of law. She is sued in her individual capacity for damages. She may be served with process at Defendant MAXIM HEALTHCARE SERVICES, INC.'s registered agent, Prentice Hall Corporation System, 7227 Lee Deforest Drive, Columbia, MD 21046. . This Defendant has been served and has yet to appear in this litigation..

17.     Defendant GEORGE ROMAN (hereinafter "ROMAN") is a deputy of the Travis County Sheriff's Office. He is employed in Travis County, Texas. At all relevant times, he was acting under color of law. He is sued in his individual capacity for damages. He may be served with process at the Travis County Sheriff's Office, 5555 Airport Blvd., Austin, TX 79751. This Defendant has been served and appeared in this litigation.

18.     Defendant MAXIM HEALTHCARE SERVICES, INC. (hereinafter "MAXIM") is an active domestic for-profit corporation which is authorized to do business in Texas and is doing business in Texas. MAXIM, through its employees, agents, representatives, and/or chief policymakers, acted and/or failed to act at all relevant times, and it is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. 1983). Defendant MAXIM acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations, and resulting damages and death. It may be served with process by serving Defendant's registered agent, Prentice Hall Corporation System, 7227 Lee Deforest Drive, Columbia, MD, 21046. *Service is hereby requested at this time.*

## II.     JURISDICTION AND VENUE

19.     As this case is brought pursuant to 42 U.S.C. § 1983, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as well as supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a), as those state law claims arise from the same case or controversy as the federal question in this matter.

20.     This Court has general personal jurisdiction over Defendants as they reside and/or work in Travis County, Texas.

21.     This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct by Defendants that killed Ms. Wyne, and which occurred in Travis County, Texas, which is within the Western District of Texas.

22.     Venue of this cause is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Travis County, which is within the Western District of Texas.

## III.     FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

23.     Anya Wyne was identified as a suicide risk shortly after her arrival at the Travis County Correctional Complex in December 2019. She was brought into custody after suffering a self-inflicted neck wound. After she was discharged from the hospital, medical staff at the Travis County Sheriff's Office flagged her as a suicide risk and ordered that she be continuously monitored and that she not be housed in a single occupancy cell. Despite these orders, Ms. Wyne was, in fact, placed alone in a single occupancy cell without audio and video monitoring on December 21, 2019. Without suicide precautions in place, Ms. Wyne succumbed to mental illness, reopened her neck wound, and bled out on the mattress in her cell. This cause of action arises from the violation of Ms. Wyne's rights as secured by the United States Constitution. These violations were committed by Defendants under color of state law and led to Ms. Wyne's death while in the custody of TRAVIS COUNTY, SHERIFF HERNANDEZ, and the Travis County Sheriff's Office at the Travis County Correctional Complex.

**A.     Travis County's well-documented systemic deliberate indifference to the medical needs of inmates in their care.**

*"Jail isn't supposed to be a death sentence, but for a few in the Travis County Correctional Complex at Del Valle's medical unit awaiting trial or sentenced to jail... it was."[1]*

-<u>Austin American-Statesman, July 12, 2018</u>

24.     On and before December 17, 2019, the Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ funded and operated a jail known as the Travis County Correctional Complex, (hereinafter "TCCC") located at 3614 Bill Price Road, Del Valle, Texas 78617.

25.     The TCCC contains the Health Services Building of the jail.

26.     Upon information and belief, physically and mentally ill inmates in need of medical care and more frequent monitoring were housed in the Health Services Building at TCCC on and before December 17, 2019.

27.     At all relevant times, officers who work in the Health Services Building are required to receive no more specialized training beyond the standard corrections officers' training regarding mental health impairments, suicide detection, and negotiating with people who are mentally ill.

28.     On and before December 17, 2019, the Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ also funded and operated a jail known as the Travis County Jail (hereinafter "TCJ"), located at 500 West 10th Street, Austin, Texas 78701.

29.     On and before December 17, 2019, the Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ held out the TCCC to be a jail facility able to competently provide for the health and welfare of its inmates.

---

[1] Hall, Katie, *Austin American-Statesman*, "Sudden Death Behind Bars: Investigators find Questionable Judgment in Some Travis County Inmate Deaths", (July 12, 2019) https://stories.usatodaynetwork.com/travis-county-jail-deaths/home/site/statesman.com/

30.     The Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ hold themselves out as being "dedicated to a high standard of service to the public and inmates at the TCJ and the TCCC."[2]

31.     TRAVIS COUNTY and SHERIFF HERNANDEZ hold themselves out as "striv[ing] to provide a safe and secure environment for inmates in [its] care as well as protection to the public" through the operation of correctional facilities, including without limitation, TCCC and TCJ.

32.     The Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ hold the TCSO out as operating a law enforcement agency that "provides for the health and welfare of the inmates."

33.     The Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ hold the TCSO out as operating a law enforcement agency that "provides comprehensive medical care to [its] inmate patients."[3]

34.     The Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ promise to provide inmates in their care a full-time medical doctor; 24/7 nursing staff comprised of registered nurses and licenses vocational nurses; a full-time registered nurse case manager dedicated to facilitating treatment and discharge planning; onsite pharmacy; full-time pharmacist; three pharmacy technicians; prescription assistance program coordinator; six full-time, mid-level practitioners; a part-time infectious disease provider; and a contract dentist.

35.     The Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ maintain an

---

[2] https://www.tcsheriff.org/inmate-jail-info/jail-info/facilities (accessed December 3, 2021)
[3] https://www.tcsheriff.org/inmate-jail-info/inmate-info/medical (accessed December 3, 2021)

Inmate Mental Health team within the TCSO.[4]

36.    The Inmate Mental Health team is comprised of a psychiatrist and nurse practitioner who prescribe medications, a psychologist, and professional counselors and clinical social workers.

37.    Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ, through the Inmate Mental Health team, purport to provide inmates with treatment based on their individual needs and determine the most appropriate and safe housing while in custody.

38.    The Mental Health Coordinator for Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO is required by Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ to collaborate with behavioral health staff, psychiatric providers, courts, and community agencies on an on-going basis regarding inmates with serious mental illness or medical needs to ensure that their needs are taken into consideration.

39.    On and before December 17, 2019 and upon information and belief, the Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ contracted with Defendant MAXIM HEALTHCARE SERVICES, INC. to jointly provide for the health and welfare of inmates of the TCCC.

40.    On and before December 17, 2019 and upon information and belief, Defendant MAXIM provided staffing, including without limitation, nursing staff, to care for patients at the TCCC.

41.    On and before December 17, 2019 and upon information and belief, Defendant MAXIM was responsible for training its staff serving in the TCCC to provide a safe and secure

---

[4] https://www.tcsheriff.org/inmate-jail-info/inmate-info/mental-health (accessed December 3, 2021)

environment for its inmates.

42.     On and before December 17, 2019 and upon information and belief, Defendant MAXIM was responsible for training its staff on suicide prevention and housing inmates safely.

43.     Nevertheless, on and before December 17, 2019 and upon information and belief, employees and agents of Defendant MAXIM were considered staff of the TCSO for purposes of providing for mental health needs of detainees at the TCSO.

44.     Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ require that all inmates entering the custody of the TCSO must be screened for mental health needs at Central Booking.

45.     The staff of the TCSO are trained by Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ to assess and refer to treatment, and make sure individuals are housed safely.

46.     Behavioral health staff of the TCSO are required to not only monitor symptoms and make referrals to prescribers, but also provide crisis counseling, education, and support based upon an individual's mental health needs.

47.     Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ require corrections staff to continually assess patients for symptoms throughout their time in custody.

48.     Despite holding themselves to these standards, Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ operate the TCCC, a correctional facility infamous for failing to provide for inmates' medical needs.

49.     On an evening in July 2018, 55-year-old Ronald Hall banged his head against the thinly padded wall of his jail cell almost 30 times until a corrections officer saw him shaking on the floor the next morning at 7:00 a.m.

50.     The officer who discovered Mr. Hall asked a nurse on duty "Hey, this guy is not

going to die on me, is he?"

51.    In response, the nurse chuckled and said that's the reason Mr. Hall was being housed in a padded cell.

52.    The officer then asked when he should call back to report on Mr. Hall's status, and the nurse responded, only "if he starts bleeding."

53.    Mr. Hall died at 10:20 a.m. that morning.

54.    Mr. Hall was one of six inmates to die in the custody of Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ in 2018.

55.    Five of those six inmates who died in 2018 were housed in the TCCC.

56.    Four of those six inmates who died in 2018 were housed in the Health Services Building of the TCCC.

57.    From 2008 to 2018, deaths in the custody of Defendants TRAVIS COUNTY and SHERIFF HERNANDEZ steadily[5] rose:



Six people died last year in the custody of the Travis County sheriff's office. Five of those deaths happened in the Travis County Correctional Complex, and four of the six deaths happened in the jail's Health Services Building.

58.    The Travis County Internal Affairs unit investigated each of these in-custody deaths

---

[5] https://stories.usatodaynetwork.com/travis-county-jail-deaths/home/site/statesman.com/
(accessed December 3, 2021).

and identified questionable judgment by jail personnel in the days or moments that led up to some inmates' deaths.

59.     Following the death of Mr. Hall, one corrections officer, G.W. Williams, was found to have failed to complete one of his required visual checks on Mr. Hall.

60.     Officer Williams was suspended for only one day and reportedly received some additional training following the death of Mr. Hall.

61.     In addition, bruises and abrasions were found throughout Mr. Hall's body.

62.     Prior to his death, nurses and officers were aware that Mr. Hall had received a head wound.

63.     According to the autopsy, two days before he died, Mr. Hall was taken to the emergency room for a fall that had happened a day prior, as well as for an altered mental status and hallucinations.

64.     The altered mental status and hallucinations were attributed to his bipolar disorder and a recent change in his medications, according to the autopsy.

65.     In the summer of 2017, an inmate named Naquan Carter was brought to TCCC from a mental health treatment facility outside of Houston, Texas.

66.     On July 24, 2018, an officer lingered in front of Mr. Carter's cell while conducting physical checks and kept returning to Mr. Carter's cell between 9:30 and 9:38 a.m. while trays were delivered.

67.     The officer did not sound the alarm about an unresponsive inmate until 9:56 a.m.

68.     Mr. Carter was pronounced dead at 10:39 a.m.

69.     In another case, 24-year-old Eric Taylor was placed in a seclusion cell and had no physical contact with any other inmates or TCCC staff.

70.    Mr. Taylor was called "Jennings" by TCCC nurse Susan Conway and provided with another inmate's medication on March 31, 2018, the date of his death.

71.    A nearby officer told Nurse Conway "That's not Jennings. It's Taylor."

72.    Nurse Conway responded "Am I supposed to fucking care?"

73.    In July 2018, Daniel Smith, the TCSO Mental Health Services Director, stated that the TCCC inmate-to-officer staff ratio is roughly 48:1.

74.    Director Smith also acknowledged that a suicidal patient is required to have one-on-one constant in-person monitoring until the suicide risk is over.

75.    At all relevant times, TCCC also utilized segregation housing, also known as "seclusion," "restrictive housing," or "solitary confinement."

76.    Upon information and belief, on and before December 17, 2019, TCCC would use seclusion cells to house mentally ill inmates who were acting out.

77.    Upon information and belief, and at all relevant times, TCCC would house mentally ill inmates in seclusion cells when medical orders specifically prohibited them from being housed alone.

78.    In 2018, 36 inmates attempted suicide in Travis County jails, though none died.

79.    Upon information and belief, TCCC officials, including all named Defendants, knew or should have known in December 2019 that its patterns, customs, and practices of isolating suicidal inmates and failing to provide adequate observation for suicidal inmates, presented a serious risk of bodily injury and death to inmates within the custody and care of TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO.


**B.    Anya Wyne is released from a mental health hospital and is hospitalized by the Austin Police Department following a domestic dispute.**

80.     On December 16, 2019, Ms. Wyne was discharged from Ascension Seton Shoal Creek Hospital, or "Shoal Creek", a private psychiatric hospital in Austin, Texas.

81.     On the evening of December 16, 2019, Ms. Wyne was released from Austin Lakes Hospital, or "The Lakes", a facility offering psychiatric services for individuals experiencing mental health crises in Austin, Texas.

82.     When Ms. Wyne was released from the Lakes, she had no place to live and was residing with her partner at 4900 Westgate Boulevard in Austin, Texas.

83.     On and before December 16, 2019, as a result of numerous police contacts, Ms. Wyne was known to law enforcement in the Austin and Travis County communities to have had deteriorating mental health.

84.     On December 16, 2019, at around 10:42 p.m., members of the Austin Police Department were called to 4900 Westgate Boulevard following a domestic disturbance between Ms. Wyne and her partner.

85.     During the dispute, Ms. Wyne had sprayed lighter fluid throughout her boyfriend's apartment, created and used a makeshift blowtorch with a cigarette lighter and aerosol can, turned on the gas stove in the apartment, lit a laundry bag on fire, and slashed her own throat.

86.     After arriving at the scene, Austin Police Officer Paul Tronco (#4830) entered the apartment and found Ms. Wyne lying on the ground on her back with a visible laceration to her throat.

87.     Ms. Wyne's neck wound was approximately four inches across and jagged, exposing internal organs and throat structures.

88.     When Officer Tronco found Ms. Wyne, she was talking incoherently.

89.     Following the disturbance, Ms. Wyne was treated by paramedics from the Austin

Fire Department and transported to St. David's South Austin Hospital Medical Center, or "South Austin Hospital."

90.     Ms. Wyne's partner informed Austin Police Officer Michael Batham (#8104) that she had been suicidal in the past.

91.     Officer Batham noted that Ms. Wyne was in a manic state, would not provide any information, and was mainly concerned with bringing her dog with her to the hospital because she would most likely be going to surgery.

92.     Austin Police Officer Kenneth Lundberg (#7317) also responded to the scene and followed Ms. Wyne to the hospital.

93.     Officer Lundberg noted that Ms. Wyne "appeared to be in the same manic state that I saw her in several days prior."

94.     Ms. Wyne refused medical treatment for her throat wound, refused to talk to Officer Lundberg until he got her some water, and asked him for a "'hot shot' to kill her."

95.     Officer Lundberg asked Ms. Wyne if she had cut her own throat, and she refused to answer.

96.     Officer Lundberg then placed Ms. Wyne on an emergency detention based on her deteriorated mental state.

97.     Officer Lundberg believed and noted in his report that Ms. Wyne was a danger to herself for refusing medical treatment and asking to be killed.


**C.     The TCSO brings Ms. Wyne into its care following her hospitalization.**

98.     On December 17, 2019, Ms. Wyne was moved from South Austin Hospital to the TCCC in Health Services cell # HSCVC6.

99.     Ms. Wyne was first seen by Defendant COTTON at 2:40 p.m. on December 17, 2019, who ordered that full suicide precautions be put in place.

100.    Later that day, TCSO Employee Ricky Hunter ordered that Ms. Wyne be assigned to a low bunk and that she not be allowed to serve as an inmate worker.

101.    On December 18, 2019, and upon information and belief, TCSO Employee Victoria Rogers generated a physical document reflecting the orders of Defendant COTTON and Counselor Hunter that was attached to Ms. Wyne's inmate file.

102.    In addition to the orders of Defendant COTTON and Counselor Hunter, this document reflected that, on December 18, Defendant COTTON stopped full suicide precautions for Ms. Wyne and Ms. Rogers ordered "psych observation" of Ms. Wyne.

103.    Under "reason" for the psych observation order, Ms. Rogers noted: "in a cell with a camera, no padded cell needed, per treatment team – can go to HS-D if needed."

104.    On December 18, 2019, Ms. Wyne was moved from cell # HSCVC6 to cell # HSCVC3.

105.    Later that day, she was moved from cell block C, to cell block D and cell # HSD24B1.

106.    Later, she was again moved from cell # HSD24B1 to # HSD22B1.

107.    On December 19, 2019, at 8:08 a.m., Ms. Wyne was treated by nurse William Derrick, RN FNP CCHP, an employee and agent of Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO.

108.    Nurse Derrick treated Ms. Wyne for her neck laceration and noted that Ms. Wyne reported having nightmares.

109.    Nurse Derrick noted that Ms. Wyne was to have a mental health appointment that

day and that her medications were current.

110.    Nurse Derrick made a plan for Ms. Wyne to continue wound care and oral antibiotics and ordered a chart review in a week "once patient is possibly more stable and able to discuss medical needs."

111.    On the December 19, 2019 visit with Nurse Derrick, Ms. Wyne's active medications list included gabapentin, quetiapine, melatonin, protonix, and Bactrim, all of which had been active since December 17, 2019, the date of her arrest, hospitalization, and emergency detention.

112.    Quetiapine is an antipsychotic medication prescribed to treat schizophrenia.

113.    Ms. Wyne was prescribed to take three 50 milligram tablets of quetiapine on a daily basis.

114.    Nurse Derrick ordered a referral to a medical provider for wound care.

115.    Ms. Wyne was then moved back to cell block C, cell # HSC 01B2 on December 20, 2019.

116.    On December 20, Defendant BELFROM completed a mental health follow up form for Ms. Wyne.

117.    During that follow up, Defendant. BELFROM noted that Ms. Wyne reported she was diagnosed with Borderline Personality Disorder, Avoidant Personality Disorder SZA, Attention Deficit Disorder, Bipolar Disorder, Post Traumatic Stress Disorder, Obsessive Compulsive Disorder, and Generalized Anxiety Disorder.

118.    Ms. Wyne reported that she sporadically took her medication during that follow up.

119.    Ms. Wyne reported a previous suicide attempt to Defendant BELFROM, wherein she ran in front of and was hit by a truck.

120.     Ms. Wyne reported that she had suicidal intent at the time of her arrest and arrival at Centralized Booking on December 17.

121.     Defendant BELFROM noted that Ms. Wyne was placed on suicide watch at South Austin Medical Center.

122.     Defendant BELFROM stopped Ms. Wyne's prescriptions for gabapentin and melatonin.

123.     In the mental health follow up form, under Self Harm Risk and Protective Factors, Defendant BELFROM listed the following risk factors: past or current treatment for mental illness; feeling sad, depressed or hopeless; trouble falling asleep or remaining asleep for a reasonable period; mood swings; high anxiety level; history of alcohol or substance use problem; and divorce or separation from spouse, children, boyfriend or girlfriend (or fear of it happening).

124.     Under mental health subjective note, Defendant BELFROM noted that Ms. Wyne found it hard to have hope, that she had been mourning the loss of her dog, experiencing regret about her actions and nightmares.

125.     Ms. Wyne further reported to Defendant BELFROM that she was experiencing "distress with being in isolation."

126.     Ms. Wyne told Defendant BELFROM that "being kept in OBS" is keeping her mind on negative memories, preventing her from gaining motivation to push forward and making her "nuts."

127.     Defendant BELFROM noted that a safety plan was completed for Ms. Wyne.

128.     Under assessment, Defendant BELFROM noted that Ms. Wyne was a moderate suicide risk due to a history of suicide ideation or attempts or unresolved past attempts, her significant undesirable change in life that causes moderate distress, and moderate amount of risk

factors.

129.    Under plan note, Defendant BELFROM ordered:

> Cleared to open multi in HSC only [for now]. Pt did engage in serious SIB while in crisis prior to her arrest but has not engaged in any SIB since her arrest. Pt had rational and logical thoughts, futuristic thinking and was able to self-advocate for a housing situation that would promote her functioning. Staffed with BH supervisor. Pt will be considered for Programs while in HSC.

130.    Defendant BELFROM referred Ms. Wyne to psychiatry services, dialectical behavioral skills development group, and grief support group.

131.    She was scheduled for a mental health follow-up on December 27, 2019.

132.    Her housing was ordered as "open psych – multiperson cell."

133.    Following this meeting On December 20, 2019, Defendant BELFROM generated a physical document reflecting the December 17 orders of Counselor Hunter that was attached to Ms. Wyne's inmate file.

134.    In addition to the December 17 orders of Counselor Hunter, Defendant BELFROM ordered "open psych" for Ms. Wyne.

135.    Under the "reason" for the open psych order, Defendant BELFROM stated "HSC only- Cell #02."

136.    The next day, on December 21, 2019, Ms. Wyne was moved from cell #HSC01B2 to cell # HSC04B, a seclusion cell.


**D.    Against medical orders, deputies place Ms. Wyne in a single occupancy cell without suicide precautions on December 21, 2019.**

137.    Before Ms. Wyne arrived at TCCC, Defendant TRAVIS COUNTY, SHERIFF HERNANDEZ, and TCSO Staff decided to close cells at the TCJ.

138.    On December 11, 2019, Defendant TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO closed the south side of the third floor of the TCJ.

139.    Following this closure, medical staff realized that the TCSO would not be able to adequately house medically monitored inmates.

140.    In response, Defendant TRAVIS COUNTY, SHERIFF HERNANDEZ, and TCSO Staff decided that inmates in need of Withdrawal Monitoring would receive a housing order from medical staff stating "TCJ Hold" and be housed in General Population at TCJ until cleared by medical staff to be transferred to TCCC.

141.    After closing the south side of the third floor at the TCJ, Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ and TCSO medical staff realized that there would be no available TCJ General Population beds for Withdrawal Monitoring inmates after the closure.

142.    Defendant TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO then ordered inmates under Withdrawal Monitoring not cleared to be transferred to the TCCC to be held in the Medical Hallway at the TCJ.

143.    Thereafter, all inmates with a Withdrawal Monitoring designation previously held in the south half of the third floor and all inmates from the fourth floor of the TCJ were housed in the Medical Hallway.

144.    Shortly thereafter, supervisors from the TCJ Central Booking department notified Defendant JENNINGS of the TCCC that there was not enough room to house inmates that would normally be housed in the Medical Hallway directly after booking.

145.    Upon information and belief, on and before December 20, 2019, Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and the corrections staff at TCSO knew that there were limited multi-bed cells in the TCCC.

146.    Upon information and belief, on and before December 20, 2019, Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and TCSO Staff knew that the limited multi-bed cells at the TCCC were needed for medically vulnerable inmates, including without limitation, inmates ordered by medical staff to be housed only in multi-bed cells because they were identified as suicide risks.

147.    Prior to December 20, 2019, Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and TCSO staff decided to move inmates from the TCJ to the TCCC despite knowledge that there were limited multi-bed cells available for medically vulnerable inmates, including without limitation, inmates ordered by medical staff to be housed only in multi-bed cells because they were identified as suicide risks.

148.    On and before December 20, 2019, Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO were in the process of displacing inmates and moving "classified housing" out of the TCJ and into the TCCC.

149.    On Friday, December 20, 2019 at 11:30 a.m., Defendant JENNINGS and Defendant BOTKIN met with TCSO Medical Services Director Mary Gallo and Inmate Mental Health & CES Director Danny Smith to discuss not having housing available for Withdrawal Monitoring inmates or new inmates in need of housing in the Medical Hallway.

150.    At that time, Defendant JENNINGS, Defendant BOTKIN, Director Gallo and Director Smith decided to have designated beds in the TCC Health Services Building for inmates under Withdrawal Monitoring Protocol so they could be moved to free up needed beds in the Medical Hallway at the TCJ.

151.    The cells so designated for Withdrawal Monitoring inmates were Cell Block B, cell # 5 and 6 for males, and Cell Block C, cell # 1 and 2 for females.

152.    Cell Block C, cell # 2 was the cell occupied by Ms. Wyne at that time.

153.    Following the meeting between Defendant JENNINGS, Defendant BOTKIN, and Director Smith, counseling staff voiced concerns that were communicated to Defendants JENNINGS and Defendant BOTKIN over displacing current occupants of the identified multi-bed cells to house Medical Observation and Withdrawal Monitoring inmates in those cells.

154.    Upon information and belief, counseling staff voiced these concerns over the need to keep medically vulnerable inmates, including without limitation, those who were identified as suicide risks, in multi-bed cells.

155.    Notwithstanding the protests of counseling staff, Defendant JENNINGS and Defendant BOTKIN moved forward with their plans of displacing current inmates housed in multi-bed cells.

156.    Defendant JENNINGS and Defendant BOTKIN planned to "readdress" the concerns of counseling regarding medically vulnerable inmate displacement on Monday, December 23, 2019.

157.    On December 20, 2019, at 1:35 p.m., Defendant BOTKIN then, via email, notified Inmate Classifications staff at the TCSO regarding the plan to address the aforementioned inmate housing and medical care issues.

158.    On December 20, 2019, at 1:42 p.m., Defendant BOTKIN then, via email, notified a number of TCSO staff, including Defendant Corrections Specialist LEAL that Withdrawal Monitoring inmates would no longer be held at the TCJ and that said inmates would be moved to the TCCC "as soon as possible."

159.    Defendant BOTKIN then notified staff, including Defendant LEAL that she had instructed Inmate Classifications staff to move inmates to make room for Withdrawal Monitoring

over the weekend, and that after the inmates were moved, Cell Block C (cell # 1 and 2) and Cell Block B (cell # 5 and 6) would become the housing assignments for female and male inmates, respectively.

160.     Defendant BOTKIN instructed staff, including Defendant LEAL, that medical slips from Medical or Counseling staff needed to be obtained prior to an inmate's transfer.

161.     Defendant BOTKIN instructed staff, including Defendant LEAL that Sergeants could not request inmate transfers from their current cell assignment without getting approval from medical staff.

162.     On Saturday, December 21, 2019, Defendant LEAL read Defendant BOTKIN's email and began emptying beds in the newly designated cells to bring Withdrawal Monitor inmates to the TCCC.

163.     On Saturday, December 21, 2019, Ms. Wyne was housed in TCCC Cell Block C, cell # 2, a cell recently reassigned to house Withdrawal Monitoring inmates from the TCJ.

164.     On and before that day, Ms. Wyne was identified as a suicide risk.

165.     On and before that day, Ms. Wyne's "medical slip" listed had a "suicide moderate hazard code."

166.     On and before December 21, 2019, all inmates at TCCC classified with a suicide moderate hazard code were required by TCSO policy to be held only in multi-bed housing unless a penological reason justified other housing accommodations.

167.     On and before that day, Ms. Wyne was under medical orders to be housed only in a multi-bed cell unless a penological justification for other housing accommodations arose.

168.     On and before that day, there was no penological reason to remove Ms. Wyne from her multi-bed housing in Cell Block C, cell # 2.

169.     On and before December 21, 2019, no counseling or medical staff authorized Ms. Wyne to be moved from Cell Block C, cell # 2.

170.     Notwithstanding Defendant BOTKIN's order not to move inmates until medical clearance was obtained, Defendant LEAL then asked Defendant VASQUEZ to move inmates from Cell Block C, cell # 2, without obtaining input or clearance from medical or counseling staff.

171.     Defendant VASQUEZ, without obtaining input or clearance from medical or counseling staff, ordered Defendant LEAL to remove Ms. Wyne from Cell Block C, cell # 2, a multi-bed cell, to Cell Block C, cell # 4, a single occupancy cell.

172.     Cell # 4 was not equipped with suicide prevention measures.

173.     Cell # 4 was not equipped with constant video surveillance.

174.     Cell # 4 was not equipped with constant audio surveillance.

175.     Upon information and belief, Cell # 4 was not inspected for contraband, weapons, or items that would pose a threat of serious bodily harm or death to an inmate listed as a moderate suicide risk with a healing neck wound to her carotid artery.

176.     Notwithstanding the inadequacy of Cell # 4 for an inmate identified as a suicide risk, Defendant LEAL then moved Ms. Wyne from Cell # 2 to HSC Cell # 4 on December 21, 2019.


**E.     Ms. Wyne reopens her neck wound, loses a tremendous amount of blood, and dies.**

177.     Ms. Wyne was placed in Cell # 4 at 09:51 a.m. that Saturday morning.

178.     Before she was placed in the cell, she was never checked for contraband, weapons, or items that would pose a threat of serious bodily harm or death to an inmate listed as a moderate suicide risk with a healing neck wound to her carotid artery.

179.    At 4:30 p.m., Ms. Wyne walked up to the post desk, where Defendant ROLLER was stationed, and through tears, expressed that she wanted her service dog taken from her boyfriend.

180.    Later, Ms. Wyne returned to speak with Defendant ROLLER again and appeared to be more upset following a phone call with her attorney.

181.    Defendant ROLLER suggested Ms. Wyne try to contact a friend or a family member between 7:00 and 7:30 p.m. that night to ask for help with the dog situation.

182.    Defendant ROLLER was logging the visuals check on the computer until 7:00 p.m. or 7:30 p.m., when she logged off and took her 30-minute break.

183.    At 7:19 p.m., Defendants BARRIENTES-DOMINGUEZ and ROMAN began conducting pill call.

184.    When Defendant ROLLER returned from break, she recalled that Defendant Nurse BARRIENTES-DOMINGUEZ and Officer Cantu were conducting pill call.

185.    Officer Cantu then took her break, and Defendant Officer ROMAN assisted Defendant Nurse BARRIENTES-DOMINGUEZ with completing pill call.

186.    At around 7:23 p.m., Defendants BARRIENTES-DOMINGUEZ and ROMAN gave Ms. Wyne her medication in Cell # 4.

187.    Ms. Wyne refused to take her medication.

188.    Between 7:23 p.m. and 7:47 p.m., Defendant ROLLER was called to another area of TCCC for a medical emergency with another inmate.

189.    When Defendant ROLLER returned to Cell Block C, she conducted a brief, hurried emergency head count of all inmates in the cell block.

190.    Defendant ROLLER conducted a visual check of Ms. Wyne's cell at 7:47 p.m.

191.    When Defendant ROLLER conducted the 7:47 p.m. visual check of Ms. Wyne, she did not enter the cell.

192.    When Defendant ROLLER conducted the 7:47 p.m. visual check of Ms. Wyne, she did not attempt to speak to or interact with Ms. Wyne.

193.    When Defendant ROLLER looked into Ms. Wyne's cell at 7:47 p.m., Defendant ROLLER paused for approximately seven seconds before proceeding to check the remaining cells.

194.    Defendant ROLLER conducted another visual check of Ms. Wyne's cell at 7:55 p.m.

195.    When Defendant ROLLER conducted the 7:55 p.m. visual check of Ms. Wyne, she did not enter the cell.

196.    When Defendant ROLLER conducted the 7:55 p.m. visual check of Ms. Wyne, she did not attempt to speak to or interact with Ms. Wyne.

197.    Defendant ROLLER conducted another head count at 8:25 p.m. and noticed Ms. Wyne lying on the bed in her cell.

198.    Defendant ROLLER noticed red marks appearing to be blood on the wall.

199.    Defendant ROLLER then yelled for assistance from Defendant ROMAN, who pressed his emergency button.

200.    Defendant ROMAN walked to Ms. Wyne's cell at approximately 8:26 p.m. and appears to use his handheld radio.

201.    Defendant ROLLER hit the door with her key attempting to get Ms. Wyne's attention and Defendant ROMAN requested backup.

202.    Defendant BARRIENTES-DOMINGUEZ ran over to assist Defendants ROLLER and ROMAN.

203.    Defendant ROLLER opened the door, and Defendant ROMAN slowly walked towards Ms. Wyne and called her by name.

204.    On the floor of Ms. Wyne's cell near the toilet was spattered blood, blood clots, a pencil, and a broken comb covered in blood.

205.    At this time, Ms. Wyne was lying across the bed on her stomach and appeared to be sleeping and holding her blanket.

206.    Defendant BARRIENTES-DOMINGUEZ rolled Ms. Wyne over and saw her neck was open, gauze had been removed from her neck wound, a brown towel was placed on her neck, and her eyes were wide open.

207.    Defendant BARRIENTES-DOMINGUEZ pulled the towel, soaked in blood, away from Ms. Wyne's neck, and they saw her stitches had been opened.

208.    Defendant BARRIENTES-DOMINGUEZ saw that Ms. Wyne's eyes were dilated, her lips and fingers were tinted blue, and that she had blood on her hands and fingernails.

209.    Defendant BARRIENTES-DOMINGUEZ called for EMS. Defendant ROLLER left Ms. Wyne's cell to call EMS. Nurse Anthony Cardinal ran to Ms. Wyne's cell with a defibrillator and started chest compressions.

210.    John Henry, LVN, of the TCJ clinic called 911 and told dispatch that an unidentified member of the TCSO staff told him to call 911 because Ms. Wyne removed the stitches on her neck and that she was digging at them.

211.    Mr. Henry called Cell Block C numerous times to ascertain the location to where EMS was supposed to respond but could not get an answer.

212.    EMS arrived at approximately 8:42 p.m.

213.    When EMS arrived, Ms. Wyne's cell was too small to continue life saving

measures, so they moved her to the day room.

214.    EMS continued with life saving measures for approximately the next half hour; ultimately, Dr. Jason Pickett of Austin Travis Count EMS pronounced Ms. Wyne dead at 9:16 p.m.

215.    The Travis County Medical Examiner performed an autopsy following Ms. Wyne's death.

216.    The medical examiner confirmed the open wound on Ms. Wyne's neck, caused by removing sutures, exposed internal damage to the neck, including a cut of the carotid artery.

217.    The Travis County medical examiner ruled the manner of death a suicide, with the cause of death being incised wound of the neck, or a wound caused by a sharp object.

218.    After Ms. Wyne's death, Defendant ROLLER claimed that she did not know Ms. Wyne's neck wound was self-inflicted until after her death.

219.    Ms. Wyne's mother was notified of Ms. Wyne's death for the first time on March 28, 2020 by Austin Police Department personnel.


**F.     Too Little, Too Late: Inmate Deaths at Travis County jails continue after Ms. Wyne's death.**

220.    Though it was too late to save Ms. Wyne, on Monday, December 23, 2019, Defendant JENNINGS kept her meeting with Director Gallo and Director Smith to address the concerns of counseling staff raised on Friday, December 20, 2019 regarding medically vulnerable inmate displacement at the TCCC.

221.    Following the meeting, Defendant JENNINGS, Director Gallo, and Director Smith ordered that Withdrawal Monitor inmates be assigned to any open bed in Cell Block B for males and Cell Block C for females.

222.    Following the meeting, and in recognition of the grave error of moving Ms. Wyne into single bed cell # 4 in Cell Block C when she was a suicide risk, Defendant JENNINGS reiterated to TCSO Inmate Classification staff that housing guidance could only be sought from counseling staff or medical staff if counseling staff was not available.

223.    Defendant JENNINGS reiterated that security supervisors, such as Defendant VASQUEZ, were not authorized to give housing guidance in the event of a conflict with counseling orders.

224.    Notwithstanding the horrifying, tragic, and preventable death of Ms. Wyne and others, inmates continue to die in the custody of Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO.

225.    On February 19, 2020, a 44-year-old female inmate named Rene Martinez[6] was found unresponsive in her cell and ultimately died.

226.    On February 26, 2021, a female inmate died after she was booked into the TCJ. She was booked on February 13, 2021 and transferred to a local hospital on February 16, 2021.

227.    On April 30, 2021, a 39-year-old male inmate named Nicholas Vanwyhe was found unresponsive in his cell and ultimately died.

228.    On June 26, 2021, a 31-year-old male inmate named Anthony Ryan Lilley was found unresponsive in his cell and ultimately died.

229.    On July 11, 2021, a 31-year-old male inmate named Alexander McFarland was found unresponsive in his cell and ultimately died.

230.    On July 27, 2021, a 31-year-old male inmate named Christopher Delarosa was

---

[6] The deaths listed in paragraphs 218-224 were announced through press releases of the TCSO and accessed on the TCSO website. https://www.tcsheriff.org/about/media/press-releases (accessed December 15, 2021).

found unresponsive in his cell and ultimately died.

231.   On November 22, 2021, a 35-year-old male inmate named Adan Torres was found unresponsive in his cell and ultimately died.

## IV.   CAUSES OF ACTION

### Count I – 14th Amendment Failure to Provide Medical Care – 42 U.S.C. § 1983
*Dominique Boyd v. Vasquez, Jennings, Botkin, Cotton, Leal, Belfrom, Roller, Barrientes-Dominguez, and Roman*

232.   Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

233.   Pretrial detainees, including Ms. Wyne throughout the duration of her detention by TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO, have a clearly established Fourteenth Amendment right to be protected from a known risk of suicide.

234.   At all relevant times, Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN had actual knowledge that Ms. Wyne carried with her a substantial risk of suicide.

235.   At all relevant times, Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN knew that suicide was a serious harm from which inmates were entitled to protection.

236.   At all relevant times, Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN were each aware of facts from which the inference could be drawn that Ms. Wyne was a substantial suicide risk, and did draw that inference.

237.    At all relevant times, Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN failed to take reasonable measures to abate Ms. Wyne's substantial risk of suicide.

238.    At all relevant times, Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN exhibited deliberate indifference to Ms. Wyne's Fourteenth Amendment rights through their acts and omissions, including, without limitation:

    a.    Defendant VASQUEZ ordered that Ms. Wyne be moved to a seclusion cell against TCSO policy and medical orders that she only be housed in a multi-person cell.

    b.    Defendants JENNINGS and BOTKIN ordered inmates, including Ms. Wyne, be moved from their multi-person cells to make room for Withdrawal Monitoring inmates without first ensuring that TCSO employees moving inmates were trained to follow medical or counseling orders over the directives of supervising Sergeants and without first ensuring that TCSO employees monitoring inmates on December 21, 2019, were trained to identify suicidal inmates.

    c.    Defendant LEAL moved Ms. Wyne to a seclusion cell against TCSO policy and medical orders that she only be housed in a multi-person cell and failed to consult with medical and counseling staff before moving Ms. Wyne to a seclusion cell.

    d.    Defendant COTTON discontinued full suicide precautions for Ms. Wyne less than one day after she slashed her own throat.

    e.    Defendant BELFROM treated Ms. Wyne on December 20, 2019, and noted that she was a moderate suicide risk and engaged in serious suicidal behavior prior to her arrest. Notwithstanding this knowledge, Defendant BELFROM failed to note on the December 20, 2019, medical slip that Ms. Wyne must be housed in a cell with a camera as Counselor Victoria Rogers ordered on December 18, 2019.

    f.    Defendant ROLLER knew that Ms. Wyne was a suicide risk yet failed to conduct adequate cell checks, failed to ensure that suicidal inmates were not in possession of contraband or weapons that could cause great bodily harm or death; failed to conduct cell checks with appropriate frequency for a suicide risk inmate, failed to enter cell number 4 when conducting cell checks at 7:47 p.m. and 7:55 p.m., failed to communicate with Ms. Wyne

during the 7:47 p.m. and 7:55 p.m. cell checks, and failed to ensure that EMS was summoned immediately when she found Ms. Wyne unresponsive.

g.   Defendant BARRIENTES-DOMINGUEZ knew that Ms. Wyne was a suicide risk yet failed to enter her cell when conducting pill call, failed to report that Ms. Wyne was refusing to take her medications on December 20 and December 21, failed to report that she was being held in a seclusion cell without video monitoring against medical and counseling orders; and failed to ensure that Ms. Wyne was returned to a multi-bed cell and/or a cell with video monitoring.

h.   Defendant ROMAN knew that Ms. Wyne was a suicide risk yet failed to conduct adequate cell checks, failed to ensure that suicidal inmates were not in possession of contraband or weapons that could cause great bodily harm or death, failed to conduct cell checks with appropriate frequency for a suicide risk inmate, and failed to ensure that EMS was summoned immediately when she found Ms. Wyne unresponsive.

239.   These and other acts and omissions of Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN were objectively unreasonable.

240.   These and other acts and omissions of Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN, were objectively unreasonable in light of clearly established law at the time of Ms. Wyne's death.

241.   As a result of Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN's unjustified failures in providing medical care, Ms. Wyne experienced extreme and unneeded physical and mental pain and ultimately died.

242.   The acts or omissions of these Defendants as described herein deprived Ms. Wyne of her constitutional rights and caused her other damages.

243.   As a proximate result of Defendants' unlawful conduct, Ms. Wyne suffered actual physical and emotional injuries, death and other damages and losses entitling Plaintiff to

compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

244.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest, and costs as allowable by federal law.

245.    In addition to compensatory damages, Plaintiff is entitled to punitive damages against these Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights and life of Plaintiff.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems appropriate and just.

### Count II – 14th Amendment Failure to Provide Medical Care – *Monell*
*Dominique Boyd v. Travis County, Sheriff Hernandez, and Maxim Healthcare Services, Inc.*

246.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

247.    At all relevant times, SHERIFF HERNANDEZ was the policymaker for TRAVIS COUNTY, the TCSO, and the TCCC.

248.    At all relevant times, SHERIFF HERNANDEZ,TRAVIS COUNTY, and MAXIM and their agents, employees, and/or officers, including Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN, were acting pursuant to expressly adopted official policies or longstanding practices or customs of Defendants SHERIFF HERNANDEZ and TRAVIS COUNTY.

249. At all relevant times, it was the duty of Defendants SHERIFF HERNANDEZ, TRAVIS COUNTY, and MAXIM to refrain from subjecting others, including those within their custody and care, such as Ms. Wyne, to a deprivation of Constitutional rights.

250. At all relevant times, in breach of said duty, Defendants SHERIFF HERNANDEZ,TRAVIS COUNTY, and MAXIM subjected Ms. Wyne to deprivation of rights in violation of the privileges and immunities secured to Ms. Wyne by the Fourteenth Amendment to the United States Constitution by engaging in the following policies, practices, and customs:

    a.    Failing to identify prisoners, including Ms. Wyne, with serious mental-health needs and to classify their needs properly;

    b.    Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Ms. Wyne;

    c.    Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency to mentally ill inmates, including Ms. Wyne;

    d.    Failing to provide hospital-level care to those who needed it, including Ms. Wyne;

    e.    Failing to provide adequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Ms. Wyne.

    f.    Failing to ensure that non-medical employees housed suicidal inmates, including Ms. Wyne, in specific areas ordered by medical and/or counseling staff, such as multi-bed cells or cells with cameras.

    g.    Placing seriously mentally ill inmates, including Ms. Wyne, in seclusion without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Ms. Wyne, in seclusion cells without adequate consideration of the impact of seclusion on mental health, and providing inadequate treatment and monitoring in seclusion for mentally ill inmates, including Ms. Wyne.

251. Defendants SHERIFF HERNANDEZ, TRAVIS COUNTY, and MAXIM together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices, and customs alleged above. Despite having

knowledge of the above, these Defendants condoned, tolerated, and through their own actions or inactions thereby ratified such policies.

252.   At all relevant times, Defendants SHERIFF HERNANDEZ, TRAVIS COUNTY, and MAXIM were aware of the risk of serious harm to gravely mentally ill prisoners, including Ms. Wyne, resulting from the aforementioned policies.

253.   Such Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of decedent, Ms. Wyne, as well as its detrimental impact on the confidence the public has in the correctional body that serves it.

254.   As a direct and proximate result of the Constitutional violations caused by Defendants SHERIFF HERNANDEZ, TRAVIS COUNTY, and MAXIM, their employees, agents and/or officers of the TCSO and the TCCC, and other policymakers, decedent Ms. Wyne was deprived of her liberty and suffered damages, including death.

255.   These policies, customs, and practices of Defendants SHERIFF HERNANDEZ, TRAVIS COUNTY, and MAXIM were the driving force behind the violation of Ms. Wyne's Constitutional rights and her death.

256.   As a direct result of the Constitutional violations caused by these Defendants, the employees, agents, and/or officers of the TCSO and the TCCC, and other policymakers, decedent Ms. Wyne's heirs suffered personal and pecuniary losses.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendants TRAVIS COUNTY SHERIFF SALLY HERNANDEZ, TRAVIS COUNTY, TEXAS, and MAXIM HEALTHCARE SERVICES, INC., awarding compensatory damages, attorneys' fees, and for any further relief this Court deems appropriate and just.

**Count III – Americans with Disabilities Act**
*Dominique Boyd v. Travis County, Sheriff Hernandez, and Maxim Healthcare Services, Inc.*

257.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

258.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

259.    Title II of the ADA requires public entities, like TRAVIS COUNTY, SHERIFF HERNANDEZ, and the TCSO to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

260.    Detention is a program and service provided by TRAVIS COUNTY and SHERIFF HERNANDEZ for ADA purposes.

261.    Here, Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN were providing the service of providing for Ms. Wyne's health and safety while she was detained and in the custody and care of Defendants TRAVIS COUNTY, SHERIFF HERNANDEZ, and MAXIM.

262.    Ms. Wyne is and was a qualified individual with a disability within the meaning of the ADA in that she had mental impairments and/or a medical condition that substantially limited one or more of her major life activities.

263.    Ms. Wyne was therefore disabled.

264.    Upon information and belief, Ms. Wyne was discriminated against by reason of her disability.

265.    Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM,

ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN violated Title II of the ADA by intentionally failing to provide Ms. Wyne the reasonable accommodations that were needed and available to allow her to receive the benefits of TRAVIS COUNTY, SHERIFF HERNANDEZ, MAXIM, and the TCSO's programs and services.

266.    Defendants VASQUEZ, JENNINGS, BOTKIN, COTTON, LEAL, BELFROM, ROLLER, BARRIENTES-DOMINGUEZ, and ROMAN failed to accommodate Ms. Wyne's disability in the following ways:

> a.    Defendant VASQUEZ ordered that Ms. Wyne be moved to a seclusion cell against TCSO policy and medical orders that she only be housed in a multi-person cell.
>
> b.    Defendants JENNINGS and BOTKIN ordered inmates, including Ms. Wyne, be moved from their multi-person cells to make room for Withdrawal Monitoring inmates without first ensuring that TCSO employees moving inmates were trained to follow medical or counseling orders over the directives of supervising Sergeants and without first ensuring that TCSO employees monitoring inmates on December 21, 2019, were trained to identify suicidal inmates.
>
> c.    Defendant LEAL moved Ms. Wyne to a seclusion cell against TCSO policy and medical orders that she only be housed in a multi-person cell and failed to consult with medical and counseling staff before moving Ms. Wyne to a seclusion cell.
>
> d.    Defendant COTTON discontinued full suicide precautions for Ms. Wyne less than one day after she slashed her own throat.
>
> e.    Defendant BELFROM treated Ms. Wyne on December 20, 2019, and noted that she was a moderate suicide risk and engaged in serious suicidal behavior prior to her arrest. Notwithstanding this knowledge, Defendant BELFROM failed to note on the December 20, 2019, medical slip that Ms. Wyne must be housed in a cell with a camera as Counselor Victoria Rogers ordered on December 18, 2019.
>
> f.    Defendant ROLLER knew that Ms. Wyne was a suicide risk yet failed to conduct adequate cell checks, failed to ensure that suicidal inmates were not in possession of contraband or weapons that could cause great bodily harm or death; failed to conduct cell checks with appropriate frequency for a suicide risk inmate, failed to enter cell number 4 when conducting cell checks at 7:47 p.m. and 7:55 p.m., failed to communicate with Ms. Wyne

during the 7:47 p.m. and 7:55 p.m. cell checks, and failed to ensure that EMS was summoned immediately when she found Ms. Wyne unresponsive.

g. Defendant BARRIENTES-DOMINGUEZ knew that Ms. Wyne was a suicide risk yet failed to enter her cell when conducting pill call, failed to report that Ms. Wyne was refusing to take her medications on December 20 and December 21, failed to report that she was being held in a seclusion cell without video monitoring against medical and counseling orders; and failed to ensure that Ms. Wyne was returned to a multi-bed cell and/or a cell with video monitoring.

h. Defendant ROMAN knew that Ms. Wyne was a suicide risk yet failed to conduct adequate cell checks, failed to ensure that suicidal inmates were not in possession of contraband or weapons that could cause great bodily harm or death, failed to conduct cell checks with appropriate frequency for a suicide risk inmate, and failed to ensure that EMS was summoned immediately when she found Ms. Wyne unresponsive.

267. Failure to provide these reasonable accommodations was intentional and illegal discrimination under the ADA, entitling Plaintiff to compensatory relief.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendants SHERIFF HERNANDEZ, TRAVIS COUNTY, and MAXIM awarding compensatory damages, attorneys' fees, and for any further relief this Court deems appropriate and just.

<u>**Count IV – Negligence**</u>
*Dominique Boyd v. Josie Barrientes-Dominguez*

268. Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

269. At all of the aforementioned times, Defendant, BARRIENTES-DOMINGUEZ, acting as a duly authorized agent of MAXIM, had a duty to use ordinary care for the safety of detainees at the TCCC, including Anya Wyne, deceased.

270. At all of the aforementioned times, Defendant, BARRIENTES-DOMINGUEZ, had a duty to provide a safe and secure environment for the detainees and inmates that were in the

custody and care of Defendant BARRIENTES-DOMINGUEZ and the TCCC.

271.     Notwithstanding said duty, Defendant BARRIENTES-DOMINGUEZ, by and through her acts and/or omissions and as an agent, employee, and deputy of MAXIM, breached her duty to decedent Anya Wyne by the following negligent acts and/or omissions in breach of her duty of ordinary care for the safety and welfare of Anya Wyne, deceased:

> a.      Defendant BARRIENTES-DOMINGUEZ knew that Ms. Wyne was a suicide risk yet failed to enter her cell when conducting pill call, failed to report that Ms. Wyne was refusing to take her medications on December 20 and December 21, failed to report that she was being held in a seclusion cell without video monitoring against medical and counseling orders; and failed to ensure that Ms. Wyne was returned to a multi-bed cell and/or a cell with video monitoring.

272.     Defendant BARRIENTES-DOMINGUEZ's failure to exercise ordinary care created an unreasonable risk of harm that was foreseeable as to detainees on the premises.

273.     Each of Defendant BARRIENTES-DOMINGUEZ's acts or omissions, taken singularly or in combination, was a proximate cause of Anya Wyne's injuries and damages.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendant JOSIE BARRIENTES-DOMINGUEZ, awarding compensatory damages, attorneys' fees, and for any further relief this Court deems appropriate and just.

## Count V – Respondeat Superior
### Dominique Boyd v. Maxim Healthcare Services, Inc.

274.     Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

275.     Defendant MAXIM employed and/or held out its associates at TCCC to be Defendant MAXIM's agents and/or representative.

276.     Therefore Defendant MAXIM is liable for the negligence of its employee during

the course and scope of their employment with Defendant MAXIM.

277.    Specifically, Defendant MAXIM's employee, acting within the course and scope of her employment had a general duty to exercise reasonable care in performing her work.

278.    Defendant BARRIENTES-DOMINGUEZ, however, failed to exercise reasonable care.

279.    As a result, Defendant MAXIM is liable for Anya Wyne's injuries and damages.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendant MAXIM HEALTHCARE SERVICES, INC., awarding compensatory damages, attorneys' fees, and for any further relief this Court deems appropriate and just.

## Count VI – Negligent Failure to Protect
### *Dominique Boyd v. Maxim Healthcare Services, Inc.*

280.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

281.    At all of the aforementioned times, Defendant MAXIM knew that Defendant BARRIENTES-DOMINGUEZ would be responsible for the safety and care of suicidal detainees.

282.    At all of the aforementioned times, it was reasonably foreseeable that suicides could occur if Defendant MAXIM failed to take proper procedures.

283.    Defendant MAXIM had a duty to protect Anya Wyne and others in Anya Wyne's situation against the risk of injury by Defendant BARRIENTES-DOMINGUEZ.

284.     Defendant MAXIM acknowledged its duty of responsibility for safety to their employees, agents, representatives, workers, managers, associates, staff, and/or independent contractors.

285.    Defendant MAXIM breached this duty by failing to protect Anya Wyne, deceased,

from the acts of Defendant BARRIENTES-DOMINGUEZ.

286.    As a result, Anya Wyne suffered serious injuries and damages, including death.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendant MAXIM HEALTHCARE SERVICES, INC., awarding compensatory damages, attorneys' fees, and for any further relief this Court deems appropriate and just.

## Count VII – Negligent Failure to Train or Educate
### *Dominique Boyd v. Maxim Healthcare Services, Inc.*

287.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

288.    Defendant MAXIM breached its duty to take reasonable protective measures to protect Anya Wyne, deceased, from suicide by failing to properly train or educate Defendant MAXIM's employees, agents, representatives, workers, managers, associates, and/or independent contractors on how to avoid such risk.

289.    As a result, Anya Wyne suffered serious injuries and damages, including death.

WHEREFORE, Plaintiff, DOMINIQUE BOYD, respectfully requests that this Court enter judgment against Defendant MAXIM HEALTHCARE SERVICES, INC., awarding compensatory damages, attorneys' fees, and for any further relief this Court deems appropriate and just.

## V.    DAMAGES

290.    Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

291.    The actions and omissions of Defendants, their agents, employees, and/or representatives caused and/or were the moving force of the injuries and damages to the Plaintiff

and were the moving force causing Ms. Wyne's wrongful death. Plaintiff thus asserts claims for compensatory damages under 42 U.S.C. § 1983 against all Defendants.

292.    Plaintiff further seeks punitive or exemplary damages against the individual defendants only under 42 U.S.C. § 1983. Plaintiff does not seek punitive or exemplary damages against Travis County or Sheriff Hernandez in her official capacity.

293.    Plaintiff, DOMINIQUE BOYD, in his capacity as the representative of the Estate of Ms. Wyne, asserts a survival claim on behalf of the estate. The Estate has incurred damages including, but not limited to conscious pain and mental anguish.

294.    Plaintiff further asserts claims on behalf of all wrongful death beneficiaries. Plaintiff and all other wrongful death beneficiaries have incurred damages including, but not limited to, the following:

    a.   Past and future mental anguish;

    b.   Past and future loss of companionship and society;

    c.   Past and future medical expenses; and,

    d.   Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value.

295.    Plaintiff, for himself and all wrongful death beneficiaries, and the Estate, are also entitled to recover attorneys' fees and expenses, including expert expenses pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law.

## VI.    JURY DEMAND

296.    Pursuant to Federal Rule of Civil Procedure 48, Plaintiff hereby demands trial by jury.

VII.       **PRAYER FOR RELIEF**

297.   Accordingly, Plaintiff asks that judgment be awarded against Defendants for

1)      compensatory damages;

2)      punitive damages against the individual defendants;

3)      attorneys' fees, including reasonable and necessary expenses including expert fees, pursuant to 42 U.S.C. § 1988;

4)      costs of court;

5)      judgment at the highest rate allowable under the law;

6)      injunctive relief;

7)      appointment of a monitor to oversee the implementation of any injunctive relief awarded; and

8)      all other relief to which Plaintiff is justly entitled.

Respectfully submitted,

By___*/s/ Ian P. Fallon*_____.

**ROMANUCCI & BLANDIN, LLC**
Antonio M. Romanucci (*pro hac vice*)
(Illinois ARDC No. 6190290)
Bhavani K. Raveendran (*pro hac vice*)
(Illinois ARDC No. 6309968)
Ian P. Fallon (*pro hac vice*)
(Illinois ARDC No. 6332303)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
E-mail: aromanucci@rblaw.net
E-mail: b.raveendran@rblaw.net
E-mail: ifallon@rblaw.net

*-and-*

**THE SIMPSON TUEGEL LAW FIRM, PLLC**
3301 Elm St.
Dallas, TX 75226
Tel.  214-774-9121
Fax. 214-939-9229
Michelle Simpson Tuegel
State Bar No. 24075187
michelle@stfirm.com
Terah Moxley
State Bar No. 24074768
terah@stfirm.com
paralegal@stfirm.com
***Attorneys for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned served all counsel of record with Plaintiff's First Amended Original Complaint in the above-captioned matter by electronically filing the same via the Case Filing/Case Management System for the United States District Court for the Western District of Texas, Austin Division, from 321 N. Clark St. in Chicago, IL on March 16, 2022.

Respectfully submitted,

By_____/s/ Ian P. Fallon_____.

**ROMANUCCI & BLANDIN, LLC**
Ian P. Fallon (*pro hac vice*)
(Illinois ARDC No. 6332303)
321 North Clark St., Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
E-mail: ifallon@rblaw.net